IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

ARTHUR DAVIS and
LARRY YARBOROUGH,

    Plaintiffs,

v.	Civil Action No. CV-00-J-3025-S

CITY OF BIRMINGHAM,
et al.,

    Defendants.

**ENTERED**
MAR 2 2 2002

## MEMORANDUM OPINION

Currently pending before the court is the defendants City of Birmingham and Chief Mike Coppage's motion for summary judgment (doc. 34), evidentiary materials in support of its motion (doc. 35), and memorandum of law. The plaintiffs responded to said motion in an untimely manner, but the court has allowed plaintiffs' response and has considered it along with plaintiffs' evidentiary submissions and defendants' submissions. Upon consideration of the pleadings, all briefs and evidentiary submissions, the court concludes that defendants Chief Mike Coppage and the City of Birmingham's motion for summary judgment is due to be **GRANTED**.

### I. Factual Background

In the light most favorable to the plaintiffs, the most unusual facts of this case are as follows:

On March 1, 1999, the plaintiffs traveled from Colbert County, Alabama to Birmingham, Alabama with $24,000.00 in cash. Complaint at ¶ 14; Davis depo. at 17. Plaintiff Yarbrough states that someone known to him as "Uncle Bubba" had called his brother (Tyrone Pryor) and told him that "the dude had a limo" so they needed to "come down to Birmingham."[1]  Yarbrough depo. at 53-54. The plaintiffs were attempting to begin a limousine service. Id. at 26, 39, 40, 45.

Yarbrough followed Uncle Bubba's directions to a gas station in Birmingham. Yarbrough depo. at 56, 57. He had the money for the limousine, $24,000.00, in a plastic shopping bag. Id. at 55, 63; Davis depo. at 18. He also had a two shot Derringer firearm.[2] Yarbrough depo. at 63.

Once in Birmingham, the plaintiffs waited for about two hours, and, as it was getting dark outside, Uncle Bubba pulled up at the gas station. Yarbrough depo. at 65-66. Yarbrough got in the car with Uncle Bubba. Id. at 67. Arthur Davis followed Uncle Bubba and Yarbrough to a pool hall next to CeCe's Convenience Store to meet the limousine salesman. Id. at 68-70; defendants' memorandum at 5. Uncle Bubba called the person with the limousine to meet them at the pool hall. Yarbrough depo. at 72. Yarbrough noticed a police car near where he was parked, and Uncle Bubba

---

[1] "Uncle Bubba's" real name is David Phillips. Yarbrough depo. at 27.

[2] Yarbrough agrees that he did not have a permit to carry a pistol. Yarbrough depo. at 64. However, he carries one anyway almost all of the time. Id. at 65.

explained that the gas station had been robbed two or three times. Yarbrough at 77-78.

Yarbrough was told to ride with Uncle Bubba and another gentleman who met them at the pool hall to see the limousine. Yarbrough depo. at 73, 83, 105. Yarbrough went along, but did not bring the money. *Id.* at 83. However, Uncle Bubba told him to go get the money, so he did, and got back in the car. *Id.* at 84. At this point, they were stopped by the police Yarbrough had noticed earlier because the driver (David) had run a stop sign leaving the parking lot. *Id.* at 81, 85-88.

David did not have a driver's license. Yarbrough depo. at 88. David was placed in the police car. *Id.* Yarbrough took the money and put it in his underwear. *Id.* at 92. The police told him to get out of the car, which he did, and he was patted down, but the police did not find the money or the gun. *Id.* at 93. He was handcuffed and placed in the back of the police car. *Id.* He states:

> the dark one he comes, but the driver, McRae (sic), he was looking all through the back seat, you know, he's looking, he's looking. So he don't find nothing, he patted me down, so after they got through, they told dude -- they told David -- and Uncle Bubba said, well, since we've got a warrant on you, we're going to let you go, ain't nothing but a misdemeanor. So they let me back out of the car and took the handcuffs back off.

*Id.* at 93-94. At that point, they still intended to go see the limousine. *Id.* at 96.

3

Yarbrough met Davis, who had been waiting at the pool hall, in the restroom at CeCe's, gave him the gun and the money, and told him to stay at the store. Yarbrough depo. at 98; Davis depo. at 27. He was concerned about the police getting the money and the gun from him. He was not yet worried about Uncle Bubba and David. Yarbrough depo. at 98. Unbeknownst to the plaintiffs, Uncle Bubba had been working with these two officers on illicit activities. Curry depo. at 61.

Yarbrough, Uncle Bubba and David again began to leave the store to see the limo when the same police officers again stopped them. Yarbrough depo. at 101, 102. Yarbrough accused the officers of harassing them, and the officers handcuffed him and put him in the back of the police car again. *Id.* at 102. At that point Uncle Bubba opened a wine cooler in front of the officers and David urinated in front of them. *Id.* at 103. The officers placed Uncle Bubba, unhandcuffed, in the car with Yarbrough. *Id.* at 104. While in the police car, Uncle Bubba quizzed Yarbrough about where he had put the money. *Id.* at 105. The police then search Uncle Bubba's car and Yarbrough's car, but found nothing. *Id.* at 105-106. The police again let all three gentlemen go. *Id.* at 106-107.

Yarbrough got in his car and drove to the back of the gas station to get Davis and go home. Yarbrough at 107-108. However, the two police officers, Uncle Bubba and David were still at the store. *Id.* at 108; Davis depo. at 33. The police officers

4

then "snatched [Arthur Davis] out of the store." Yarbrough depo. at 108. The officers found the pistol and Davis was placed in the back of the police car with a "drunk" or "bum." Davis depo. at 32, 35. The officers drove around to the back of the pool hall and "put the bum out." Davis depo. at 38. Uncle Bubba and David pulled up behind the officers. *Id.* at 39. The police officers had Uncle Bubba get in the car with Davis and ask him where the money was. *Id.* at 41. At this point, the money is in Davis' underwear. *Id.* at 40. The police officers tell Uncle Bubba to "get gone." *Id.* at 42. Officer McCray took Davis out of the car, put his hands behind his back, dropped his pants and took the money. *Id.* at 42-43. Davis is then driven around for a while, and the officers threaten to kill him. *Id.* at 32, 48-49. Davis is then left about a block from the bus station. *Id.* at 50. He went to the bus station. *Id.* at 54. While there, he saw Uncle Bubba ride by.[3] *Id.*

Defendant Officers McCray and McMillian told Davis that if the plaintiffs tried to find out anything about the officers, they would be killed. Yarbrough depo. at 126; Davis depo. at 48-49. McCray also threatened Yarbrough when he called him on the phone. Yarbrough depo. at 126-127.

---

[3]Yarbrough, at some point, took Davis' car back to Florence. Defendants' memorandum at 6. Davis called his wife in Florence, who drove to Birmingham to pick him up. Davis depo. at 55-56.

Yarbrough contacted the Internal Affairs division ("IAD") of the Birmingham Police, told them what happened, and gave a robbery report. Yarbrough at 124; Davis depo. at 57-58. He spoke with Sergeant Larry Fowler and Sargent Blanton. Yarbrough depo. at 124. Yarbrough learned from Fowler that McCray had been involved in similar activities previously. *Id.* at 127.

Fowler and Blanton came to Florence to speak with the plaintiffs on two occasions. Yarbrough depo. at 128-132, Davis depo. at 60. They had Yarbrough's brother call Uncle Bubba to try to get him to say that the police officers were involved, but he would not. *Id.* at 129. IAD recovered the gun and $800.00 of the plaintiffs' money from McMillian, who had put the money in his checking account. *Id.* at 134-135. McMillian testified against McCray and McCray was convicted. *Id.* at 135-136.

Yarbrough knew that McCray was fired from the Birmingham Police Department and McMillian resigned as a result of his report to IAD. Yarbrough depo. at 136-137. Uncle Bubba is in jail on unrelated charges. *Id.* at 137.

Captain William Patrick Curry, from the Crimes Against Persons Division, was asked by the police chief, Johnnie Johnson, to conduct an investigation.[4] Curry depo. at 41. Curry asked the FBI to investigate McCray several times. *Id.* at 9, 36-38.

---

[4]Defendant Mike Coppage has since replaced Johnnie Johnson as Police Chief.

Neither of the previous investigations produced any evidence which could be used against McCray. *Id.* at 17-19, 92; Fisher depo. at 8, 12-13.[5] Upon the plaintiffs' complaints, Curry again requested assistance for an undercover operation from the FBI. *Id.* at 32-33. In Curry's judgment, a sting operation against McCray was the best way to catch him. *Id.* at 77. Meanwhile, IAD was conducting its own investigation. Curry depo. at 34. Curry kept Chief Johnson informed as the investigations progressed. *Id.* at 35.

At the time, McCray was a field training officer with an excellent record as none of the suspicions against him could be proved. Curry depo. at 49. His superior at the West Precinct was Captain George Cooley. *Id.* at 76-77.

Officers undergo a sixteen week or longer academy training and have a set of rules and regulations on how to conduct investigations and themselves as police officers. Curry depo. at 69. The Birmingham Police Department is one of the approximately 100 out of 45,000 police departments in the county which is accredited and follows all the standards set by the nation accreditation board. *Id.* at 67, 72, 74. The IAD reports directly to the chief of police to allow less chance for hindrance of investigations and to keep him informed. *Id.* at 76-77.

---

[5]Michael Fisher is commander of Internal Affairs. Fisher depo. at 4. All of the page numbers on the deposition excerpts of Captain Fisher submitted by the plaintiffs are illegible. Therefore, the court refers to said deposition by chronological page number.

Birmingham police officers are trained on a continuing basis. Curry depo. at 70. The officers receive training on what crimes are and the elements of those crimes, including robbery and theft. *Id.* Curry investigates robbery by a police officer no differently that one by a civilian arrested off the street. *Id.* at 74. However, the officers also have the same rights as any civilian. Cooley depo. at 16. Birmingham Police Department's policy is to put officers who commit crimes in jail. Curry depo. at 75. The department has conducted sting operations against officers thought to be involved in crimes for many years. *Id.* at 77-78.

IAD conducts administrative investigations. If a crime is alleged against an officer, the department conducts a parallel investigation as well. Cooley depo. at 30-32. Typically, allegations of criminal activity are investigated by the criminal division and not IAD because the criminal division is better at investigating crimes. Cooley depo. at 78-79. In fact, the chief of police will go directly to an officer to investigate, bypassing his commander, to hold down on the chance of and opportunity for leaks within the department. *Id.* at 80; Fisher depo. at 3, 6. This keeps the investigation more honest and protects the integrity of it. *Id.* at 81. When evidence of criminal activity by a police officer is found, it is presented to the District Attorney's office for possible charges. *Id.* at 81-82. The department then moves to terminate that officer. *Id.* at 82. The department has no policy of tolerating criminal activity by an officer.

*Id.* Department policy requires complaints to be channeled through IAD. Fisher depo. at 4-5. However, criminal complaints are handled by the criminal division as IAD cannot bring criminal charges against an officer. Fisher depo. at 7.

McCray had a complaint against him in July, 1997, was found guilty of giving a false statement to IAD and given a punishment of 15 days without pay. Cooley depo. at 83. A second administrative charge was brought against him for refusing to take an assault report and he was given a command discipline. *Id.* at 84-85. He also had four administrative charges brought against him for being late to work. *Id.* at 85.

## II. Standard of Review for Evaluating a Summary Judgment Motion

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The Supreme Court has explained:

> [T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be no genuine issue as to any material fact, since the complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial.

*Celotex Corp.*, 477 U.S. at 322-23. The party moving for summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings or filings which it believes demonstrates the absence of a genuine issue of material fact. *Id.* at 323. The burden then shifts to the non-moving party to "go beyond the pleadings and by ... affidavits, or by the 'depositions, answers to interrogatories, and admissions on file' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324, Fed.R.Civ.Pro. 56(e). In meeting this burden the non-moving party "must do more than simply show that there is a metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). That party must demonstrate that there is a "genuine issue for trial." Fed.R.Civ.Pro. 56(c); *Matsushita*, 475 U.S. at 587. *See also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

On motions for summary judgment, the court shall construe the evidence and factual inferences arising therefrom in the light most favorable to the nonmoving party. *See Adickes v. SH. Kress & Co.*, 398 U.S. 144, 157 (1970); *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993).. The substantive law will identify which facts are material and which are irrelevant. *Anderson,* 477 U.S. at 248. A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict

for the non-moving party." *Anderson*, 477 U.S. at 248. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *Id.* at 249. The basic issue before the court on a motion for summary judgment is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251-52.

### III. Legal Analysis

### A. Chief Coppage

The defendant Police Chief Mike Coppage is sued solely in his official capacity. The defendants argue, and this court agrees, that the suit against the Chief in his official capacity is redundant of the claims against the city itself. Defendants' memorandum at 8. As such, the court finds that defendant Chief Coppage is due to be dismissed from this case. *See Busby v. City of Orlando*, 931 F.2d 764 (11th Cir.1991). The court shall so order.

### B. The City of Birmingham

When a § 1983 claim is asserted against a municipality, the court must examine two different issues: "(1) whether plaintiff's harm was caused by a constitutional violation, and (2) if so, whether the city is responsible for that violation." *Collins v.*

11

*City of Harker Heights, Texas*, 503 U.S. 115, 120, 112 S.Ct. 1061, 1066; 117 L.Ed.2d 261 (1992).

The defendant City does not dispute that the Constitutional rights of the plaintiffs were violated by the actions of Officers McCray and McMillian. The plaintiffs argues that defendant is liable under § 1983 because:

> The City of Birmingham developed and maintained policies or customs exhibiting deliberate indifference to the Constitutional rights of persons in Birmingham, Alabama ....
>
> It was the policy or custom of the City of Birmingham to inadequately and improperly investigate citizen complaints of police misconduct, and acts of misconduct were instead tolerated .....
>
> It was the policy and/or custom of the City of Birmingham to inadequately supervise and train its police officers ... thereby failing to adequately discourage further Constitutional violations ....
>
> As a result of the above described policy or customs, police officers of the City of Birmingham ... believed that their actions would not be properly or adequately monitored ... and that misconduct would ... be tolerated.
>
> The above described policies and customs demonstrated a deliberate indifference on the part of the policymakers of the City of Birmingham ... and were the cause of the violations of the plaintiffs' rights ....

Complaint at ¶¶ 33-37.

The City argues that it cannot be held liable for the violation of the plaintiff's civil rights based solely on the theory of respondeat superior. A municipality may not be held liable solely because it employs a tortfeasor, in other words, respondeat

superior liability will not attach under § 1983. *City of Canton, Ohio v. Harris*, 489 U.S. 378, 385, 109 S.Ct. 1197, 1203, 103 L.Ed.2d 412 (1989). Thus, the city cannot by liable for officers making false arrests or even robbing citizens. Rather, the plaintiffs must demonstrate an official custom or policy which causes the constitutional violation. *See Monell v. Department of Social Services*, 436 U.S. 658, 690-91, 98 S.Ct. 2018, 2036-37, 56 L.Ed.2d 611 (1978); *Collins*, 503 U.S. at 120-121, 112 S.Ct. at 1066.

The failure to properly train or supervise its officers, without more, also is insufficient for liability. The plaintiffs must show instead that policy or custom of failing to properly train or supervise its officers caused the violation of their rights. *City of Canton, Ohio v. Harris*, 489 U.S. at 389-91, 109 S.Ct. 1197; *Gold v. City of Miami*, 151 F.3d 1346, 1350 (11th Cir. 1998). "There are 'limited circumstances' in which a local government will be held liable because it inadequately trained or supervised its employees, who then infringed upon a plaintiff's constitutional rights." *Thomas v. Roberts*, 261 F.3d 1160, 1173 (11th Cir. 2001).

The Eleventh Circuit Court of Appeals has noted that a municipality will rarely have an express policy of negligent supervision. *Gold,* 151 F.3d at 1350. Therefore, plaintiff may show deliberate indifference by presenting "some evidence that the

municipality knew of a need to train and/or supervise in a particular area and the municipality made a deliberate choice not to take any action (citations omitted)." *Id.* In other words, municipal liability can attach under § 1983 only where a deliberate choice to follow a course of action is made from among various alternatives by city policymakers. *See City of Canton*, 489 U.S. 378, 388, 109 S.Ct. 1197, 1205; citing *Pembaur v. Cincinnati*, 475 U.S. 469, 483-484, 106 S.Ct. 1292, 1300-1301, 89 L.Ed.2d 452 (1986).

In this case, the plaintiffs complained, and the defendant took action. The two officers responsible for violating the plaintiffs' rights are no longer employed by the defendant city, and one of them was convicted for his criminal acts. These actions by defendant City of Birmingham fail to show an indifference to plaintiff's constitutional rights or a deliberate choice by the municipality to take no action. *See Gold*, 151 F.3d at 1350. The plaintiffs have failed to present any evidence of a policy or custom by the city which allowed the violations of the plaintiffs' rights. *See Brown v. City of Clewiston*, 848 F.2d 1534, 1540 (11th Cir.1988)(the existence of an unconstitutional policy is an essential element of the plaintiffs' claims). Under this set of fact, the court finds no genuine issue of material fact from which a jury could find this defendant was deliberately indifferent to the plaintiffs' rights and hence impose liability under 42 U.S.C. § 1983.

## IV. Conclusion

The court, finding that there are no genuine issues of material fact in dispute, and that the defendant is entitled to judgment in its favor as a matter of law, **ORDERS** that the defendants' motion for summary judgment is hereby **GRANTED**. The plaintiff's claims against defendants Mike Coppage and the City of Birmingham are **DISMISSED WITH PREJUDICE.** Each party is to bear its own costs.

This case remains set for trial and pretrial as previously ordered on the remaining counts of the complaint against defendant McCray.

**DONE** this __21__ day of March, 2002.

_____
INGE P. JOHNSON
UNITED STATES DISTRICT JUDGE